Sandoz is a city in Japan, located in the northeastern part of Fukuoka Prefecture, Japan.  Next case is Otsuka Pharmaceutical Company v. Sandoz et al. in Apotex, May it please the Court, after almost a month of trial, the District Court made very detailed fact-findings in which the Court made credibility determinations regarding expert testimony, regarding the witnesses, and the comments have failed to establish any basis to find those fact-findings clearly erroneous or that the Court committed any legal error. With respect to some of the specific issues that were just raised, Otsuka has contended all along that one has to actually find, consistent with this Court's precedent in Daiichi, Takeda, Isai, one has to find some basis why one of Ernie's skill in the art would have been led to a particular compound and start there as part of an anti-psychotic drug discovery effort. And then, you have to point something in the park that would teach one to modify the compound in a specific way to get the desired result. Here, what the District Court ultimately said at one point is, appellants have tried to just pluck things from the art and say this looks like a picture of something that would be like a drug discovery. For general obviousness, I understand your argument, but Ms. Holland has made a good point. Quite frankly, it didn't come across as clearly in the briefing, but I'm sort of latching onto it now in my mind and I'd like to hear you respond to it. In the context of obviousness-type double patenting, when you're starting necessarily with the unsubstituted butoxy, that's the molecule you're starting with. And if the Nakagawa Declaration is one of the things in the prior art, even though it discloses five things, it's not one of the situations where you're just cherry-picking, right? You only can look at the unsubstituted butoxy as the starting point. Maybe it is or isn't obvious in light of that, but what do you think of that argument? Your Honor, I think there are two separate issues. One is, what do you start with? We agree that in a double patenting analysis, one starts with the claim, what is in that claim. But then you have to look at what analysis do you conduct once you have that compound? And I would harken back even to Judge Richard's concurrence in the signature case from a long time ago where he said, the analysis is the same because the principle is the same. If you look at what an awardee's skill in the art would do, looking at that compound, would they think of that compound as an antipsychotic? What would they do to try to modify it to become an antipsychotic? That's where the appellant's argument falls apart. Even their argument for, obviously, double patenting, Teva's argument, focuses on motivation. They try to veil it as to it's a little bit different and it looks the same, but even though it's a little bit different. But really, it's a motivation. Why would one look at that compound, think of it as an antipsychotic, and then why would you go about modifying it in a specific way? We did argue in the district court and agree with at least the question that was posed, is why would one look to Well, the court found, and you don't seem to be appealing this fact finding, that the Nakagawa Declaration and its comments about mouse jumping equated to schizophrenia, to basically equated to antipsychotic. You did not appeal that in the brief. I don't see any appeal of that fact finding. We've got the Nakagawa Declaration, which lists an unsubstituted butoxy molecule, only one out of the five, and actually links it exactly to antipsychotic testing showing good activity. Wow, that's really close. Your Honor, I think that's the argument that appellants have made, but we believe that overstates what the court did. What the court said was that the test in the Nakagawa Declaration, the mouse jumping test, is something that one skilled in the arts might look to as potential antipsychotic activity. In the brief, Tessa says it's excellent antipsychotic activity. Nowhere did the court find that the Nakagawa Declaration established excellent antipsychotic activity. Where is that district court finding? Do you happen to know? Because I remember it not being so equivocal the way you just said it, and I might be wrong. There are two parts of the opinion. In one part of the opinion, she said that the Nakagawa Declaration said it could show a potential for that activity. It could be used to show potential for that activity. Later, the court concluded that if you take that premise, it showed middling potency. She put it in between all of the other compounds that were there. Four were much more potent. And going to the Daiichi case, if you're looking at motivation, the promise of potency, potency outweighs mere structural similarity. And if you look at the Declaration, you would be looking to modify the unsubstituted butoxy compound and turn it into a 2-ethoxy-propoxy-linked 5-baker compound. That's what you would learn from the Nakagawa Declaration, even if you accepted that it would be something one would look to to modify the unsubstituted butoxy compound. Well, I understand that's your argument about what one would learn from it, but really what I was more curious about was the fact findings of the district court, which I thought pretty clearly linked the unsubstituted butoxy to... The district court did find the unsubstituted butoxy showed middling potency in the Nakagawa Declaration. 5.5. 5.5. Right? Yes, Your Honor. And the best was .5. Yes, the 2-ethoxy-5-linked-propoxy compound was 10 times more potent than the... And that's why the court found middling potency for the unsubstituted butoxy. It hasn't identified any reason or any motivation why one's skill of the art would go a certain path or a certain route to change that in a specific way in order to get enhanced antipsychotic activity. Well, Ms. Holland argues that the Nakagawa Declaration suggests using the CL chloride, whatever those CLs are. Can I have a repeat of the suggestion? Because I know they can't find really anything that would teach one skill of the art. This additive theory is that one would just look at the Nakagawa Declaration, see there's a 2-chloro and there's a 3-chloro, and automatically go, and voila, it should be a 2-3-chloro. The district court specifically rejected Teva's argument in that regard and found it conclusory and inconsistent with the testimony regarding unpredictability that Motsuka's experts provided. Mike Cook just pointed out on 3805, Nakagawa characterizes the activity of all the testing compounds as, quote, excellent. So the fact that it was 5.5 and there might have been a better one, this one was still referred to as excellent in terms of its activity. In the context of that declaration, that is correct. In the context of that declaration, the Nakagawa Declaration was saying that that class of compounds compared to the prior compounds that they were testing was excellent, showed excellent activity in the mouse jumping test. It doesn't say, and take that next step, that this is to show excellent activity. I know you don't have a lot of time, but why does mouse jumping correlate to schizophrenia? If you can do it in one or two sentences. If not, I'll research it on the Internet. It actually does, Your Honor, and actually the court found that. The court found that the mouse jumping test actually doesn't really correlate to anti-schizophrenic activity. The court did hold against Motsuka the comments that you just noted in the Nakagawa Declaration and during prosecution of another patent, but the district court ultimately found that the real test for anti-psychotic activity in schizophrenia is the anti-morphine seriotomy test, and the court specifically found that you can't correlate that to those two. In fact, the court found if you look at unsubstituted methoxy in the anti-apomorphic seriotomy test, it's inactive. So notwithstanding what it says in the mouse jumping test. Do you think the Nakagawa Declaration is fair game for someone wanting to summon a skill in the art who was motivated to try to improve on certain compounds? No, Your Honor. That's because our position is that once skill in the art, we need to be directed to that in some way, be looking for that declaration. It was a 1,500-page prosecution history, and now I'm a little biased because it goes back to 1988, and the concept that once skill in the art was able to find a prosecution history in 1988, and then known to go find in that prosecution history the Nakagawa Declaration. You mean because they were in giant shoes in the patent office? If they were there, especially after the patent issue. But there's now a presumption because everything's on the Internet and you can get things quickly. But we don't believe that once skill in the art would have been motivated to go find that. Now, you have never really challenged it on appeal, have you? Have you challenged the prior art status of Nakagawa, like in a traditional printed publication sense? It wasn't cataloged in a meaningful way. It wasn't available to the public. We challenged that below, Your Honor. And then on appeal, we noted in our footnote our disagreement with the court's finding. Is its status as prior art really the issue? No, Your Honor. The issue is whether one would be motivated to look there. That's correct, Your Honor. We're looking at the motivation element. It's not whether it is prior art, but why would one go there and find it? It's probably a little easier than going to Sweden and finding the thesis. That's probably true, Your Honor. But the fact of the case and the findings were that the experts of the defendants noted that they had never – they're the experts saying, oh, finding on motivation, and they didn't even know how to find the prosecution. Does the Declaration teach a way in any way? Absolutely, Your Honor. It teaches the most potent compound. And again, going back to the test in Tahiti, which is you have to look at what looks like promising potency, not structural similarity alone, was the five-linker to epoxy compound. And the next most potent compound was also a five-linker compound, epoxy compound. So the government declaration actually teaches you an entirely different direction. And that's part of the issue in this case, is the arts taught a hundred different directions, and the defendants have not established, by clear and convincing evidence, that one skill in the art would have been to direct it a certain route, a certain path, as discussed in Shinjuku. Does it matter to us the amount of compounds that were listed under the heading of antihistamine in the Nagasaki Declaration? Nakagawa Declaration. I think the Nakagawa Declaration needs to be taken in context. It was trying to establish superior properties of the prior art. Two of the tests were antihistamines, and one of the tests was this mouse-jumping test. And one has to look at it in context. If you look, the unsubstituted butoxy was in the mouse-jumping test. But if you look at the 416 patent itself, what it ultimately claimed after the Nakagawa Declaration, it claimed the unsubstituted butoxy is an antihistamine, not as a TNS controlling agent. Now, this is very crowded out. All these substituents were known. And I also note that 4392 is ascertained to be a safe compound and to have some advantageous effects. So why wasn't 4392 a potential lead compound? Well, Your Honor, if you go to the point at the time of the critical date, September 31, 1988, by that time, the literature had shown that yes, it was safe in the sense of it was intoxicant. It didn't kill people. It had serious side effects. It had serious problems. And once the O2 was expert, which the court credited, testified that one would look at that and read those disclosures as discouraging one towards garbage styrofoam. And in fact, that's what the history has shown. I mean, it's worth noting that right now there are only ten atypical antipsychotics approved. And they fall in three classes. One is clozapine in its progeny. One is risperidone in its progeny. And the last class is aripiprazole. There is no other carbostyral compound that's approved antipsychotically. And aripiprazole was the first of that class? It's the first and only of its class. And after 24 years, no one else has been able to come up with another carbostyral compound. So you're saying what should have been the lead compound? The lead compound, as shown by history, were clozapine, which begat so many derivatives. Risperidone, which begat so many derivatives. Even Apotex admits in its reply brief, no one else in 1988 was looking at carbostyrals. And what did the court find with respect to what was the lead compound? The court didn't actually find the lead compound. The court rejected each of the defendant's appellate's proposed lead compounds and then noted that, if anything, one would have also been looking at clozapine or risperidone lead compounds. In other words, you're saying they looked backwards until they found something that was in the ballpark and called that a lead compound? Correct. That's what's in our briefs. We think this is a classic hindsight analysis where they just try to go find something structurally similar among 9 trillion compounds in 416 patents, among hundreds of examples in the other references, and have tried to say, those would be lead compounds. Would your argument be a lead compound is either clozapine or risperidone? Would that be the lead compound, then, in your... Our argument would, though, that would, at that point in time in 1988, where carbosylin 4392 had been shown not to have antipsychotic activity and also have backside effects, one would not have looked at carbostyrals. They would have looked at clozapine or risperidone. And started tweaking stuff on those. Which is what everyone did. That's actually been proven through time. Now, if one accepts, well, maybe they disregarded the value of 4392 and looked at carbostyrals and one looked at Nakagawa, it's clear that one would go to the 5-linker propoxy compound shown in Nakagawa, or if you go to the 922 patent, which had 6-linker compounds with alkyl groups. They weren't... It would be... The art was teaching in different directions for carbostyrals. Can you address real quickly the application of Geneva Farm's case here in this case with respect to double patenting? Yes, Your Honor. Our position is that the felons are taking advantage of dicta and a footnote in that case where the court's precedents were clear that these two analyses are the same. And that in Geneva, it was an anticipation case when it came down to it. District courts which have reviewed that case, the Federal Circuit is upon rule, that district courts have applied it, have all looked at it and considered it to be an anticipation case. Moreover, if you look at the court's precedent prior to Geneva, there were instances in double patenting where the court looked at motivation. The court looked at secondary considerations such as unexpected results. So those... That's... To the extent Teva argues Geneva rules, prior precedent rules over Geneva. Along the lines, if my colleagues would indulge me, because I know your time is up, so one final question for me at least would be, going back to the question I asked you earlier, while the test might be the same, when you're looking at obviousness type double patenting, Ms. Holland's argument seems persuasive that you at least are... Since you're starting with the claim molecule which is unsubstituted butoxy, you then are going to look from there at the prior art, from that vantage point, from the unsubstituted butoxy vantage point, which is quite distinct from just the general obviousness inquiry where you're not starting with unsubstituted butoxy, it could be anything. Do you agree with that logical starting point? We agree with that, Your Honor, that a double patent analysis requires one to start with what's claimed. But then you have to ask the question, to do what? What are you going to do with it? You have to have a thing you're deciding you're going to do with this compound, a goal. Why would you have a goal of anti-psychotic activity for a compound which has been disclosed to be an antisemite? Thank you, Mr. Monroe. Ms. Holland, we'll give you two minutes to rebuttal. Thank you, Your Honor. To address very quickly Judge Rayne's question concerning Geneva, Mr. Monroe said that that was an anticipation case. It's unclear from that case whether it was anticipation or obviousness, but regardless, a later Federal Circuit decision, Procter & Gamble v. Teva, was clearly an obviousness type double patenting case and adopted that same holding, that distinction between double patenting and obviousness. But didn't Longi precede those cases? And Longi says it's the same analysis. We have to go to the earliest, the first decision of the Federal Circuit. There are different formulations in many different Federal Circuit cases. I believe there's an in-ray of Longi's case that says that it's similar to, but not exactly the same as, obviousness, a double patenting inquiry. So there were several different formulations, but none of them said it was exactly the same inquiry. Longi says that, quote, a double patenting of the obviousness type rejection is analogous to a failure to meet the non-obviousness requirements except that the patents principally underlying the double patenting rejection is not considered prior art. Yes, analogous, Your Honor, which, again, I would say is not the same. I would also add that there was later case law development on motivation on these compounds that maybe wasn't in existence at the time of Longi, but the case law developed. The case law on that issue developed. The case law on the difference was developed as well. And there is a clear statement from the Federal Circuit that motivation, secondary considerations, etc., aren't part of that double patenting analysis. Getting to the point about Nakagawa and prior art, I submit that once you find Nakagawa is prior art, that is— When should we find it to be prior art? Was it actually a printed document that was accessible to the public? Yes, Your Honor. It's clear case law that the file history of an issued patent— Part of the file history. Was there any other place that this declaration could have been accessed? No, Your Honor. It was part of the file history that the law is, and it's been set forth in Federal Circuit cases like Takeda v. Alpha Farm, Breckelmeyer. Once a patent issues its file history, it becomes public on the day the patent is issued. Well, that's patent office practice for decades and decades and decades. It should not be in dispute here. It is public. That means it's open to the public and potentially prior art, but that doesn't say anything about whether one would be motivated to go in there. Your Honor, once it's prior art, the person of ordinary skill is presumed to know its contents. We're talking about hypothetical person of ordinary skill. It's not like they have it on their shelf in their office. They're presumed to know the contents of the prior art. Once Nakagawa is prior art, it is fair game for all its teachings. You don't need a motivation to go there. A particular person of ordinary skill in the art is presumed to know its teachings. Do you have one final thought? Yes, Your Honor. One thing that Mr. Monroe said was that all we can say is that Nakagawa suggests the addition of chlorines, but under KSR, we don't need more than that. The prior doesn't have to say use chlorines in this particular situation. Nakagawa's empirical data shows that if you put chlorines in those two positions, you're going to improve activity. That's all a person of ordinary skill in the art needs to know to make that substitution. In the double patenting context, it's just comparing aricliprazole to the unsubstituted butoxy, and that's the exact substitution. That's the exact difference. Thank you, Ms. Holland. Mr. Feldman has a minute left. Thank you, Your Honor. I'll do my best in a minute. One thing that came up in Mr. Monroe's argument is with respect to why no one else was doing carbostyle derivatives. Well, that's the direct impact of the 416 patent and the genus patent is it blocked everyone else from playing in the carbostyral space. Hatsuka was the only party that could play in the carbostyral space. You can make compounds for experimental purposes and go seek a license if they find a better one. Sure, but why would you do that? They own the space. You can't commercialize it. There was evidence in the record that others... They have to publish it in a medical journal that it's better than anything on the market. Who's going to deny you a license? Well, there's evidence in the record that no one was going to be motivated to do that. Another point that I want to make is that you don't have to do a lead compound analysis under our obviousness theory, particularly with respect to the propoxy dichloro because it's the closest homologue. And so the standard is, is there anything unexpectedly better about erypropozole compared to the propoxy dichloro? We believe there's evidence that there wasn't. We believe that the data, the actual empirical data from the Nakagawa Declaration between a propoxy versus a butoxy shows that you're going to expect that butoxy compounds are going to have more potency and that's the only difference between the propoxy dichloro and the butoxy dichloro, which is erypropozole. One final thought? One final thought is this. By making it too easy to get patents on these particular compounds, I understand there's benefits that's given by these particular compounds and that they're helping people, but you're not actually enhancing innovation at all. What you're really doing by making it too easy by allowing people to just make minor changes and variations. And remember, this only took three months for them to go from OPC-4392 to erypropozole and that's only because they mislabeled the bottle. Okay, once they realized there was activity at the two and the three position, it took them like a couple days to get to this compound. How long did they spend in clinical trial and in clearance to the FDA? They spent obviously a lot of time in OPC-4392. Maybe 10 years. But that's in the prior art. That counts against them for this purpose. They don't get the second benefit. Thank you. Okay, so we thank you a number of times. Thank you. Thank you. All rise.